896 F.Supp. 1170 (1995)
LOGGERHEAD TURTLE (Caretta caretta), Green Turtle (Chelonia mydas), Shirley Reynolds and Rita Alexander, Plaintiffs,
v.
The COUNTY COUNCIL OF VOLUSIA COUNTY, FLORIDA, a political subdivision of the State of Florida, Defendant.
No. 95-587-Civ-Orl-22.
United States District Court, M.D. Florida, Orlando Division.
August 1, 1995.
*1171 *1172 Lesley Gay Blackner, Penland & Block, P.A., Jacksonville, FL, for plaintiffs.
Jeffrey D. Keiner, John A. Kirst, Jr., Gray, Harris & Robinson, P.A., Orlando, FL, for defendant.

ORDER
CONWAY, District Judge.
This cause comes before the Court on Plaintiffs' Motion for Preliminary Injunction (Dkt. 2), Defendant's Emergency Motion to Strike Or, in the Alternative, Objections to Plaintiffs' Supplemental Exhibits (Dkt. 31), Defendant's Emergency Motion For Leave to File Supplemental Exhibits as to the Issue of Standing (Dkt. 35), and Defendant's Emergency Motion for Leave to File Its Request for Judicial Notice of the Volusia County Home Rule Charter (Dkt. 37).
The Plaintiffs are suing the Defendant County Council of Volusia County ("Volusia County") under the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A), for violating 16 U.S.C. § 1538(a)(1)(B), which prohibits the "taking" of a federally listed endangered species without a permit from the United States Fish and Wildlife Service. The Plaintiffs claim that Volusia County's beach-related ordinances regarding lighting and vehicular access pose an immediate danger to Loggerhead sea turtles and Green sea turtles, and that this threat of future injury necessitates a preliminary injunction to stop any unlawful taking.
After considering the arguments and exhibits submitted by the parties, the Court concludes that the Plaintiff's motion must be granted in part and denied in part, as explained below.

I. INTRODUCTION
The U.S. Fish and Wildlife Service has declared that the Loggerhead sea turtle is a "threatened" species. See 50 C.F.R. § 17.11. The Service also lists the Green sea turtle as "endangered" for the "breeding colony populations *1173 in Florida" See 50 C.F.R. § 17.11. Both of these species of sea turtle may be found generally in the tropical and temperate waters of the Earth's oceans.
Volusia County is located in northeast Florida and has some forty miles of coastline abutting the Atlantic Ocean. Both the Loggerhead and Green sea turtles are known to inhabit the Atlantic Ocean waters off of Florida, and come ashore onto the Florida beaches, including Volusia County beaches, to nest and lay their eggs. The U.S. Fish and Wildlife Service has not listed Volusia County as a critical habitat for either species of sea turtle.[1]

A. Nesting Behavior of the Loggerhead and Green Sea Turtles
The nesting season in Florida for Loggerhead and Green sea turtles begins May 1st and continues until October 31st. During these months the adult female sea turtles come ashore at night to lay their eggs. On the shores of Volusia County's beaches, the sea turtles dig their nests and lay their eggs on the seaward edge of the dunes. The dunes form the western border of the beach, stretching parallel to the shoreline.
After choosing a spot for the nest, the adult female sea turtle digs a shallow cavity in the sand, and lays dozens of eggs into this cavity. The mother sea turtle then covers the eggs with sand and returns to the sea. The adult female Loggerhead and Green sea turtles do not have the maternal instinct to tend or return to their eggs once they have been laid.
In Florida Loggerhead and Green sea turtle eggs incubate for almost two months. After the incubation period, the sea turtle hatchlings break out of their shells. The hatchlings emerge from their sand nest during the night, when they sense the decrease in the temperature of the sand.
For the sea turtle hatchlings to survive they must reach the sea soon after emerging from their nest. Under natural conditions, turtle hatchlings escape from the nest, orient themselves toward the sea, and reach the surf within several minutes. The turtle hatchlings instinctively orient themselves seaward by crawling toward the reflection of the night sky off the ocean waters and surf. Experts have concluded that "[t]he principal component of the sea-finding behavior of emergent hatchlings is a visual response to light." See National Marine Fisheries Service and U.S. Fish and Wildlife Service, "Recovery Plan for U.S. Population of Green Sea Turtle." National Marine Fisheries Service, Washington, D.C., p. 6 (1991); National Marine Fisheries Service and U.S. Fish and Wildlife Service, "Recovery Plan for U.S. Population of Loggerhead Sea Turtle." National Marine Fisheries Service, Washington, D.C., p. 8 (1991). Failure to reach the sea quickly greatly increases the likelihood that death will result due to exhaustion, dehydration, or predation from crabs or birds.

B. Volusia County's Beach-related Ordinances

1. Artificial beachfront lighting
Volusia County has enacted a lighting ordinance to regulate public street lights and artificial private lighting along the unincorporated beach areas and in the coastal town of Ponce Inlet. Pursuant to Volusia County ordinance, certain beachfront municipalities, such as Daytona Beach and Daytona Beach Shores, are permitted and have undertaken the responsibility of enforcing their own lighting ordinance for public street lights and private beachfront lighting.[2]
Volusia County claims that its lighting ordinance was designed to limit interference and misorientation among sea turtles during nesting season. The evidence indicates that Volusia County has worked with the local power company to enforce the County's lighting ordinance when known violations are brought to the County's attention. The evidence suggests that Volusia County has installed *1174 or is in the process of installing special light fixtures for its street and beach lights in order to minimize the amount of illumination cast onto the beach which is harmful to sea turtle nesting behavior. The Plaintiff's expert, however, disputes the sufficiency of the County's efforts and the effectiveness of its lighting ordinance in reducing disorientation among sea turtles.

2. Driving motor vehicles upon the beach
Volusia County is empowered by the State of Florida to regulate vehicular access to the County's coastal beaches. See Fla.Stat.Ann. § 161.58 (West 1990). Volusia County permits vehicles to drive on its beaches, and through its Beach Code the County regulates the time and circumstances under which vehicles are permitted on the beach. Pursuant to the County's Beach Code, vehicles are generally permitted to drive on the beaches from one hour before sunrise until one hour after sunrise. Volusia County has modified these times between the dates of May 1st and October 31st to accommodate sea turtle nesting season. From May 1st through June 30th, vehicular access is permitted from 7 a.m. until 8 p.m., and from July 1st through October 31st such access is permitted from 8 a.m. to 7 p.m. Evidence submitted by the Plaintiffs, however, strongly suggests that Volusia County has opened the vehicle gates or permitted private vehicles access to the beaches at earlier hours during the sea turtle nesting season.
In addition to permitting daytime traffic on the beach, Volusia County allows vehicles to park on the beaches until midnight. Volusia County also issues special permits to commercial fishermen, who then have authorization to drive upon the beach at night. Volusia County also authorizes public safety, beach ranger, and turtle patrol vehicles to drive on the beaches at night. It appears from the evidence that Volusia County is using or is in the process of acquiring for these county vehicles special yellow headlights in order to avoid disorienting sea turtles.
Volusia County's Beach Code also establishes and regulates the driving lanes and parking areas on the beach. The Beach Code provides for two lanes of traffic, one northbound and one southbound. The western edge of the southbound lane is set at the mean daily high tide line. The Beach Code establishes the parking zone as the area extending thirty feet west (landward) of the mean daily high tide line.
As part of its Beach Code, Volusia County has adopted a "conservation zone," which extends seaward from the dunes for a distance of thirty feet. This "conservation zone" stretches the entire length of the coastline beach under Volusia County's jurisdiction. The dunes, and thus the "conservation zone," are a variable distance from the ocean waters at different sections of the Volusia County beaches. Driving is not permitted in the dunes. Volusia County permits vehicles to park up to fifteen feet into the "conservation zone" from the seaward side. The evidence before the Court strongly suggests that the conservation zone is not adequately marked to prevent private vehicles from parking and driving within the whole of the "conservation zone." More significantly, evidence submitted by the Plaintiffs indicates that private vehicles regularly drive and park within the entire "conservation zone."
Periods of high tide pose a major problem for maintaining the sanctity of this "conservation zone." At high tide, beach traffic is forced away from the ocean and further up the beach into the conservation zone. As a result, vehicles encroach upon the conservation zone both for driving and parking. Volusia County's Beach Director has the authority to close the beaches to vehicle traffic during high tide, or to regulate beach traffic as appropriate. Nevertheless, the evidence before the Court strongly suggests that this authority has not been exercised to prevent driving and parking within the prohibited areas of the "conservation zone."

C. Problems associated with beach driving and artificial beachfront illumination

1. Artificial beachfront illumination
Artificial beachfront lighting significantly increases the incidence of injury to and mortality of sea turtle hatchlings. It is wellestablished *1175 that artificial lighting from buildings, streetlights, beach lamps, and nearby vehicles cause disorientation (loss of bearing) and misorientation (incorrect bearing) in sea turtle hatchlings.
The effects of disorientation or misorientation are frequently fatal. Turtle hatchlings crawl toward the alternative light source or meander along the beach rather than head toward the sea. Hatchlings thereby become entangled in dune vegetation, or may be struck by vehicles after having crawled to nearby roadways. Hatchlings which have successfully navigated their way to the ocean may become misoriented in the surf or the waters just off the shore. Strong artificial lighting may even draw hatchlings out of the surf and back onto the beach. Thus misguided, turtle hatchlings inevitably succumb to exhaustion, dehydration, predators, or the weight of motor vehicles.
Artificial illumination also interferes with the nesting efforts of mother sea turtles. Loggerhead and Green sea turtles abort nesting attempts with greater frequency in areas with bright beachfront lights.

2. Beach driving
When automobiles are permitted to drive on the beaches where Loggerhead and Green sea turtles nest, these species face significant peril. In the first place, vehicles leave tire ruts in the sand. Sea turtle hatchlings attempting to reach the ocean may be forced to negotiate these ruts. Hatchlings climbing over a rut may fall upon their backs and be stranded, inverted, for critical minutes while they attempt to right themselves. Hatchling sea turtles, having entered a tire rut, also have been observed to follow the tire rut to wherever it leads, rather than to pursue a course to the ocean. In both of these cases, the hatchlings are exposed for prolonged periods of time, and not uncommonly expire from dehydration, depredation, or are run over.
There is evidence in the record, however, suggesting that tire ruts closer to the shoreline on Volusia County's beaches are washed out by high tide. Volusia County has further undertaken to rake the beach every evening to smooth out any remaining tire ruts. There is a disagreement between the parties' experts as to the effectiveness of Volusia County's raking and rut-removal system.
Secondly, nighttime driving on the beach poses a number of hazards to the health and safety of Loggerhead and Green sea turtles. Headlights, like other artificial lighting, can disorient or misorient emergent hatchlings. Vehicles may run over sea turtle hatchlings as they attempt to reach the ocean, or hatchlings which are washed back up on the beach during periods of heavy surf. Vehicles may strike adult female sea turtles as they are nesting, or in transit to or from nesting. In addition, headlights may discourage adult female sea turtles from nesting and result in aborted nesting attempts.
Finally, driving on beaches where sea turtles nest can damage the nests themselves. Vehicles situated directly above a clutch (group) of sea turtle eggs can cause sand compaction which decreases successful incubation and directly kills sea turtle embryos. A vehicle which passes over a clutch of sea turtle eggs can cause one or more of the following life-threatening conditions: (1) increased pressure on the sand above the eggs, causing the paper-thin eggshells to burst and the developing embryos to perish; (2) increased pressure on the sand above the eggs, causing sand to be forced into the air spaces between eggs, decreasing the oxygen which can diffuse into the eggs and resulting in increased embryo mortality; (3) increased pressure on the sand above the eggs, crushing hatchlings that have come out of their shell but have not yet emerged from the nest; and (4) displacement of sand, exposing eggs to the elements and to predators, decreasing nesting success.[3]

D. Related Administrative Action
In 1994, the U.S. Fish and Wildlife Service warned Volusia County that permitting vehicular *1176 access to its beaches was resulting in the unlawful taking of turtles. Since that time, Volusia County asserts that it has been working in conjunction with U.S. Fish and Wildlife Service to develop a conservation plan, in order to minimize any harm to the sea turtle population. In conjunction with its conservation plan, Volusia County asserts that it has implemented a number of steps to minimize harm to nesting sea turtles. These steps include: (1) restricted beach access; (2) protecting the "conservation zone;" (3) hiring an environmental coordinator; (4) working with the volunteer "turtle patrol;" (5) raking the beach to remove tire ruts; and (6) enforcing a "turtle-friendly" lighting ordinance.
Volusia County has applied for an incidental taking permit pursuant to 16 U.S.C. § 1539.[4] Volusia County filed its application for an interim incidental taking permit on July 17, 1995. Based upon time requirements for notice and publication in the federal register, a taking permit may be issued, if at all, no earlier than September 1995.

E. Present Action
The Plaintiffs claim that Volusia County's permitting beach driving results in and will continue to result in the death and injury of sea turtles, for the duration of the nesting season. The Plaintiffs also claim that Volusia County's lighting ordinance is ineffective to prevent disorientation among Loggerhead and Green sea turtles, and that Volusia County is thereby responsible for the subsequent harm visited upon these disoriented turtle hatchlings.
The Plaintiffs now seek a preliminary injunction to prevent vehicular access to the County's beaches during the sea turtle nesting season. The Plaintiffs also seek a preliminary injunction compelling the County to enforcethroughout the whole countythe "Model Lighting Ordinance for Marine Sea Turtle Protection."

II. ANALYSIS
The Endangered Species Act is the most comprehensive legislation to protect endangered species ever enacted by any nation. Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180, 98 S.Ct. 2279, 2294-95, 57 L.Ed.2d 117 (1978). "The plain intent of Congress in enacting [the Endangered Species Act] was to halt and reverse the trend toward species extinction, whatever the cost." Tennessee Valley Auth., 437 U.S. at 184, 98 S.Ct. at 2297.
The Endangered Species Act provides that, "with respect to any endangered species of fish or wildlife ... it is unlawful for any person ... to take any such species." 16 U.S.C. § 1538(a)(1)(B). By federal regulation it is likewise unlawful for any person to take any species listed as "threatened."
Congress defined the statutory term "take" to mean: "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" has been defined by regulation as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." See 50 C.F.R. § 17.3. "Harm" has been defined by regulation as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential *1177 behavioral patterns, including breeding, feeding or sheltering." See 50 C.F.R. § 17.3.

A. Volusia County's Affirmative Defenses
Volusia County has advanced several affirmative defenses as to why this case should not go forward. The Court addresses these arguments before turning to the merits of the Plaintiffs' motion.

1. Standing
Volusia County attempts to derail the instant lawsuit by challenging the individual Plaintiffs' standing. Volusia County claims that Plaintiffs Shirley Reynolds and Rita Alexander are not interested in saving the turtles, but only filed this action because they want to remove vehicles from the beaches for their own personal enjoyment.
A species protected under the Endangered Species Act has standing to sue "in its own right" to enforce the provisions of the Act. Marbled Murrelet v. Pacific Lumber Co., 880 F.Supp. 1343, 1346 (N.D.Cal.1995).
The Court shall not inquire at this stage into the individual Plaintiffs' motivations in bringing the instant action. Since both the Loggerhead sea turtle (caretta caretta) and the Green sea turtle (chelonia mydas) are named Plaintiffs in this action, the case will proceed regardless of the motivations of Shirley Reynolds and Rita Alexander.

2. Primary Jurisdiction
Volusia County argues that the Court should stay or dismiss the instant action under the doctrine of primary jurisdiction. Volusia County argues that the Court should refrain from advancing with the merits of this case because the U.S. Fish and Wildlife Service has worked with the County on a sea turtle conservation plan, and the County has now filed for an incidental taking permit.
"`Primary jurisdiction' ... comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." United States v. Western Pacific R.R. Co., 352 U.S. 59, 63-64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).
The Court concludes that the doctrine of primary jurisdiction is inapplicable to the present case. Enforcement of the Endangered Species Act here does not require the resolution of any issues by the U.S. Fish and Wildlife Service. The Court shall not have to determine whether the County's conservation plan will effectively minimize harm to the species, or determine to what degree the County's activities will affect the ability of the sea turtles to recover in population. Instead, the Court is called upon to ascertain whether the County's activities will likely result in future takings of protected sea turtles. This is no invasion of the Fish and Wildlife Service's expertise. The Service shall apply its expertise when it considers Volusia County's application for an incidental taking permit.
Moreover, the Court is not divested of jurisdiction over this case simply because the County has filed an application for an incidental taking permit. While the County may receive such a permit in the future, the pendency of the permit application is irrelevant to the question of whether or not the County's activities will result in the taking of a protected species tomorrow. Cf. Natural Resources Defense Council, Inc. v. Outboard Marine Corp., 692 F.Supp. 801, 809 (N.D.Ill. 1988) (in action to enjoin defendant from future dumping of pollutants beyond that allowed by defendant's permit, doctrine of "primary jurisdiction" not applicable merely because defendant has appeal pending before agency to increase amount of pollutants it can dump).

3. Res Judicata
Volusia County asserts that the instant action is barred by the doctrine of res judicata. The basis for this affirmative defense is the fact that, three years ago, Plaintiff Shirley Reynolds challenged the validity of Volusia County's ordinance permitting vehicular access to its beaches. This lawsuit, *1178 heard in state court, resulted in a decision upholding the County's ordinance. The judge in that case found that the permitting of vehicular access was a reasonable regulation of a customary right.
The judgment in the earlier case has absolutely no preclusive effect in the instant action. Res judicata requires the existence of four identities, including the identity of the cause of action. At the outset it is clear this identity is lacking. The Florida court case concerned questions of state property law and the reasonableness of county legislation. The instant case involves alleged takings of a federally protected species.

4. Laches
Volusia County argues that the instant action is barred by the doctrine of laches. Volusia County explains that driving has been permitted on its beaches over the past seventeen years that the Loggerhead and Green sea turtles have been federally protected. Volusia County argues that Plaintiffs' delay of seventeen years in bringing the instant lawsuit to enjoin vehicular access defeats any claim by the Plaintiffs that there is any "immediate and irreparable harm."
This argument is so tenuous as to be absurd. The vigor with which Volusia County advances this defense heightens, rather than diminishes, the absurdity. Two federally protected species are facing imminent injury and death on the beaches of Volusia County. The Supreme Court has read the Endangered Species Act to declare the loss of any species "incalculable." Volusia County cannot now thwart the intention of Congress by using as a shield the fact that for the last seventeen years it has continuously placed at risk the welfare of these federally protected sea turtles.

B. Test for Issuing a Preliminary Injunction
Under the customary standard, a party seeking a preliminary injunction must demonstrate to the court that (1) the moving party will likely succeed on the merits of the case, (2) the threatened harm is irreparable, (3) the balance of hardships favors the moving party, and (4) the preliminary injunction serves the public interest. See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir.1994). This is not the test, however, for preliminary injunctions under the Endangered Species Act.
The broad language of the Endangered Species Act and the pronouncements of the Supreme Court persuade this Court that, in considering the entry of an injunction under the Endangered Species Act: (1) the Court does not have the "traditional equitable discretion" to balance the parties' interests, (2) any threatened harm is per se irreparable harm, and (3) the public interest always favors the imposition of an injunction under the Act. See, e.g., Tennessee Valley Auth., 437 U.S. at 174, 184, 98 S.Ct. at 2291-92, 2296-97; Accord National Wildlife Fed'n, 23 F.3d at 1511.
Volusia County argues that the Court, in deciding whether or not to impose a preliminary injunction, should consider the devastating effect on Volusia County if a preliminary injunction were granted. Volusia County also desires the Court to consider the County's efforts to minimize the harm which the County's beach-related policies inflict upon the sea turtles. The County points to its working relationship with the "turtle patrol," the U.S. Fish and Wildlife Service, and other such efforts undertaken to reduce the likelihood of the "taking" of protected sea turtles.
Congress gave the Secretary of the Interior the authority to weigh these circumstances in deciding whether to issue an incidental take permit. See 16 U.S.C. § 1539. The federal courts were not granted similar discretion in deciding whether to issue an injunction.
In Tennessee Valley Authority, the Supreme Court upheld the imposition of an injunction that stopped the federal government from completing the Tellico dam project. The Tellico dam, if completed and operated, would have eradicated a federally listed endangered species. The federal government had already spent tens of millions of *1179 dollars on the project. The Supreme Court observed that:
[one might say] in this case the burden on the public through the loss of millions of unrecoverable dollars would greatly outweigh the loss of the snail darter. But neither the Endangered Species Act nor Art. III of the Constitution provides federal courts with authority to make such fine utilitarian calculations. On the contrary, the plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable." Quite obviously, it would be difficult for a court to balance the loss of a sum certaineven $100 million against a congressionally declared "incalculable" value, even assuming we had the power to engage in such a weighing process, which we emphatically do not.
Tennessee Valley Auth., 437 U.S. at 187-88, 98 S.Ct. at 2298.
Volusia County points to language at the end of the Supreme Court's recent decision in Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon, ___ U.S. ___, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), as an indication that the Supreme Court has softened its stand on the strictness with which courts must construe their obligations under the Endangered Species Act.
In Sweet Home, the Defendant challenged the reasonableness of the Interior Department's regulation defining and interpreting the word "harm" as that term is used in the Endangered Species Act. The Supreme Court upheld the regulation, finding it was a reasonable exercise of the Secretary's authority. At the end of the Opinion of the Court, the Supreme Court observed that: "In the elaboration and enforcement of the ESA, the Secretary and all persons who must comply with the law will confront difficult questions of proximity and degree; for, as all recognize, the Act encompasses a vast range of economic and social enterprises and endeavors. These questions must be addressed in the usual course of the law, through case-by-case resolution and adjudication." Volusia County argues that the Supreme Court, by way of the above-quoted dicta, intended for future courts to undertake a "case-by-case" consideration of the affected economic and social enterprises when considering cases under the Endangered Species Act. Volusia County thus concludes that this Court may consider all efforts undertaken by the County and the potential effect on the County in deciding the merits of the instant motion for preliminary injunction.
The Court agrees with the County in a limited sense. Under the Endangered Species Act, concepts such as "harm" and "harass" are subject to differing and complex analyses. An analysis of the concept of "significant habitat modification," for example, must take account of various fact-specific circumstances which can only be assessed within the context of the case itself.
As for a balancing of affected "economic and social enterprises," the language of the Act clearly leaves this job to the Secretary of the Interior and U.S. Fish and Wildlife Service. The provisions allowing incidental taking permits and hardship exemptions fall within the province of the Department of the Interior. See 16 U.S.C. § 1539. If Congress had wanted the federal courts to undertake a similar balancing of interests, it could have enacted such legislation. Such language is notably absent from the Endangered Species Act, and this absence gains increased significance from the fact that Congress has firsthand knowledge of the severe economic and social consequences which may be incurred as a result of this lack of balancing. See Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180, 98 S.Ct. 2279, 2294-95, 57 L.Ed.2d 117 (1978).
Nor does the Court find that this latest Supreme Court opinion in Sweet Home provides the authority to engage in such a balancing. The passage quoted above must be understood within the context in which it was written. The defendants in Sweet Home were challenging the reasonableness of the Interior Department's regulation defining "harm" as including "significant habitat modification." The defendantssmall landowners, logging companies, families dependent on the forest product industriesasserted that the application of this regulation to several federally listed species, including the Northern Spotted Owl, had injured them economically. *1180 The Supreme Court upheld the regulation after considering the language, legislative history, and structure of the Endangered Species Act. In the paragraph immediately preceding the one quoted directly above, the Supreme Court noted that:
The task of defining and listing endangered and threatened species requires attention to detail that exceeds the normal province of Congress. Fashioning appropriate standards for issuing permits under § 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion. The proper interpretation of a term such as "harm" involves a complex policy choice.
Consequently, this Court reads the Sweet Home opinion as addressing the balancing of competing interests and policies which the Interior Department undertakes in issuing its regulations and taking permits, and not as giving the lower courts license to balance related social and economic concerns.
Moreover, the broad scope and legislative history of the Act convinces the Court that a showing of threatened future harm to a protected species creates an irrebuttable presumption that the threatened harm is irreparable. See, e.g., H.R.Rep. No. 93-412, p. 4-5 (1973) U.S.Code Cong. & Admin.News 1973, p. 2989 ("The value of this genetic heritage is, quite literally, incalculable"), quoted in Tennessee Valley Auth. v. Hill, 437 U.S. 153, 178, 98 S.Ct. 2279, 2293, 57 L.Ed.2d 117 (1978).
Volusia County argues that a preliminary injunction should not be entered since: (1) Volusia County is not a critical habitat for the Loggerhead and Green sea turtle, and (2) any "takings" that are occurring do not threaten the Loggerhead and Green sea turtle species with extinction.
Volusia County misreads the Endangered Species Act. It is irrelevant for the purposes of the Act whether the "taking" at issue involves a critical habitat or not. Moreover, the Act does not distinguish between a taking of the whole species or only one member of the species. Any taking and every takingeven of a single individual of the protected speciesis prohibited by the Act. See 16 U.S.C. § 1538. Hence the future threat of a even single taking is sufficient to invoke the authority of the Act. See Swan View Coalition, Inc. v. Turner, 824 F.Supp. 923, 938 (D.Mont.1992) (threatened extinction is not necessary for a finding of harm under the Endangered Species Act).
The Ninth Circuit has recently held that the future threat of harm to two members of a protected species is sufficient to invoke the provisions of the Endangered Species Act. See Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781 (9th Cir.1995). In Rosboro, the defendant logging company proposed to clearcut timber in forty acres of land. The forty acres were located in an area that was a "threatened or endangered species site." A study had revealed that the clearcutting would occur on land adjacent to a nesting site of a pair of Northern Spotted Owls, a federally listed threatened species. The Ninth Circuit reversed the lower court's decision to dismiss the case on summary judgment, finding disputed issues of fact as to whether the logging would impair "essential behavior patterns" of the two owls.
Based on the analysis above, the Court concludes that petitioners seeking a preliminary injunction under the Endangered Species Act must show: (1) that the wildlife at issue is protected under the Endangered Species Act, and (2) that there is a reasonable likelihood that the defendant will commit future violations of the Endangered Species Act. Accord National Wildlife Fed'n v. Burlington Northern R.R., Inc., 23 F.3d 1508, 1510-1511 (9th Cir.1994).
The federal regulations are clear, and Volusia County does not contest, that both the Loggerhead sea turtle and the Green sea turtle are protected under the Endangered Species Act. Thus the only avenue of inquiry remaining for the Court is to determine whether the Plaintiffs have met their burden of showing that the County's conduct is reasonably likely to result in any "taking" of these protected species.

C. Volusia County's Lighting and Beachfront Illumination Ordinance
The evidence at this stage overwhelmingly supports the conclusion that artificial *1181 beachfront lighting harms and harasses the Loggerhead and Green sea turtles within the meaning of the Endangered Species Act. More specifically, the Court finds that the evidence decidedly favors the conclusion that artificial lighting is responsible for the "taking" of these sea turtles on the beaches of Volusia County.
Yet the more difficult legal question concerns what the Court can do about this "taking." The evidence suggests that Volusia County has a lighting ordinance in effect, that this ordinance was adopted with the protection of the sea turtles in mind, and that Volusia County has sought to enforce this ordinance where violations have been identified. The Plaintiffs claim that Volusia County's current lighting ordinance is ineffective in preventing disorientation of sea turtles. Plaintiffs further argue that Volusia County's lighting ordinance exempts several beachfront municipalities, so that the County essentially permits those municipalities to enforce a beachfront lighting ordinance which is not "turtle-friendly." The Plaintiffs propose that the Court issue an injunction compelling the County to enforce county-wide Florida's "Model Lighting Ordinance for Marine Turtle Protection."
In the first place, the Court cannot conclude at this stage that Volusia County's lighting ordinance is reasonably likely to result in the taking of any sea turtles. There is insufficient evidence in the record on which the Court can base a finding that specific lights for which Volusia County is responsible in the unincorporated beach areas or the Town of Ponce Inlet have disoriented sea turtles.
Secondly, if the Plaintiffs have a complaint against the beachfront illumination ordinances adopted by municipalities exempt from the County's lighting regulations, the Plaintiffs may bring a suit under the Endangered Species Act against those cities. There is no reason for the Court to believe that Volusia County is prohibited from allowing its separate cities and townships from regulating their own beachfront lighting. The Court would be on unstable constitutional ground if it attempted to compel the County to enforce Plaintiffs' model lighting ordinance in the city of Daytona Beach after Daytona Beach was granted, by valid ordinance, the authority to regulate its own lighting. Furthermore, since Daytona Beach is not a party to the instant action, the Court is unable to assess the impact of Daytona Beach's beachfront lighting regulations and policies.
Finally, the Plaintiffs have not presented the Court with any legal authority by which the Court has the power to tell the County to pass and enforce a specific piece of legislation. Volusia County's lighting ordinance does not violate, in and of itself, the Endangered Species Act. If it did, the Court could strike the ordinance down by authority of the Supremacy Clause. But by what authority may the Court compel the County to enforce a proposed item of local legislation? It may be that the Endangered Species Act vests such power in a federal court. This Court, however, will not exercise such authority without guidance from the higher courts.
In sum, the Court concludes that the Plaintiffs have not shown that Volusia County's artificial beachfront lighting ordinance is reasonably likely to "take" sea turtles in the future. Moreover, the Court declines to compel the County to enforce a different, stricter lighting ordinance, even with respect to those municipalities which, by the County's permission, have their own lighting codes.

D. Vehicular Access to Beaches
As a preliminary matter, the Court finds that since Volusia County has the authority to regulate vehicular access to its beaches, and since Volusia County permits others to drive upon its beaches, Volusia County assumes the responsibility for ensuring that those vehicles do not "take" federally protected species.
By the instant motion, the Plaintiffs request that the Court enjoin Volusia County from permitting any vehicles on its beaches. The Plaintiffs bear the burden of demonstrating that vehicular access to the County's beaches is reasonably likely to cause a future "taking" of protected sea turtles. The Court concludes that the Plaintiffs have partially *1182 met their burden, and that a limited injunction at this stage is mandated by the Endangered Species Act.
The evidence before the Court strongly indicates that nighttime driving on the County's beaches is likely to harass and harm Loggerhead and Green sea turtles. As the Court observed above, these turtles are placed at harm when vehicles drive upon their nesting grounds at night. On Volusia County's beaches, misorientation, disorientation, and death of protected sea turtles are the direct byproducts of permitting vehicles with distracting headlights to drive upon the beach at night.
The Court concludes that Volusia County permits vehicles upon its beaches at night at the cost of "taking" federally protected sea turtles. As the County is responsible for the actions of those it permits to enter onto its beaches, the County is liable for the taking of these protected species. Consequently, the Court has no alternative but to enjoin the County from permitting private vehicles onto its beaches during the nighttime hours. In order to ensure that the beaches are clear during these hours, the Court enjoins the County from permitting any vehicles on its beaches from one hour before sundown until one hour after sunrise. The hour lag time before sundown will permit the County to ensure that all private vehicles are off the beach before nightfall. The hour lag time after sunrise will permit the County to ensure that there are no sea turtle hatchlings still lingering on the beach which could be run over.
The Court does not, by this injunction, ban those County vehicles which are equipped with yellow or "turtle-friendly" headlights and which are operated by or in conjunction with the County, including public safety, beach ranger, and turtle patrol vehicles.
The Court also finds that there is a reasonable likelihood of future takings of protected sea turtles if vehicles are permitted to park and drive in the "conservation zone." The evidence before the Court suggests that the Loggerhead and Green sea turtles lay their nests near the dunes, in the area which Volusia County has termed the "conservation zone." The evidence also clearly demonstrates that vehicles drive and park with impunity throughout this "conservation zone." Such encroachment into this protective area is especially common during periods of high tide. By continuing to drive and park in the "conservation zone," vehicles on Volusia County beaches will likely continue to destroy emergent and pre-emergent sea turtle hatchlings. It is also likely that these vehicles will continue to leave tire ruts in the soft sand which will not be smoothed out by Volusia County's raking apparatus, and which ruts will trap and disorient sea turtle hatchlings.
Since the Plaintiffs have demonstrated that the future takings of sea turtles is likely if cars are permitted in the "conservation zone," the Court has no alternative under the Endangered Species Act but to enjoin Volusia County from permitting any vehicles to enter the "conservation zone." There is no exception to this injunction, and at times of high tide Volusia County will have to find a method of regulating beach traffic that does not include permitting cars up into the "conservation zone." Since the periods of high tide are known and published in advance, the Court expects the County to prepare a strategy to deal with this problem.
To reiterate, the Court enjoins Volusia County from permitting private vehicles upon its beaches at night and from permitting vehicles to drive and park within the conservation zone. As to the remaining vehicular traffic now permitted on Volusia County's beaches, the Court finds that the evidence does not demonstrate that daytime traffic is likely to result in the taking of protected sea turtles. The evidence indicates that tire ruts created by vehicles are washed out by the high tide or are smoothed out by Volusia County. The parties' experts dispute the effectiveness of the County's rut-removal system. After reviewing the recent "turtle patrol" logs filed by the Plaintiffs, the Court concludes that the County's efforts may in fact be effective. At this stage, however, the Court is unable to definitively determine or find sufficient evidence in the record which indicates that daytime traffic which is kept out of the conservation zone will likely "take" Loggerhead or Green sea turtles.
*1183 If a trial on the merits reveals that the "taking" of protected sea turtles is reasonably likely even from daytime traffic, the Court shall at that time impose an appropriate remedy. Yet based upon the evidence before it, the Court cannot conclude that the taking of sea turtles is reasonably likely as a result of daytime traffic confined to permitted areas of the beaches of Volusia County.

E. Defendant's Emergency Motions
Defendant has recently filed three emergency motions, one the day before the hearing on the preliminary injunction motion, and two during the following week. Defendant's emergency motions did not aid the Court in any way in resolving the motion for preliminary injunction. These "emergency" motions, which did not arise from any true emergency, served only to divert the Court's attention from a consideration of the merits of the case.
Belated exhibit filings and objections to Plaintiffs' exhibits did not constitute the sort of emergencies which required the Court to drop everything it was doing to consider these arguments. Defendant's objections to the Plaintiffs' exhibits are noted. The other two motions were only emergencies because Volusia County failed to timely file exhibits in opposition to the motion for preliminary injunction. The Court declines to consider exhibits which were not filed within the prescribed period.
ACCORDINGLY it is ORDERED that Plaintiffs' Motion for Preliminary Injunction (Dkt. 2) is GRANTED IN PART AND DENIED IN PART. The Defendant is enjoined from permitting vehicles upon its beaches at night until November 1st, 1995, except as permitted by this Order. Furthermore, the Defendant is enjoined from permitting vehicles to enter the "conservation zone" until November 1st, 1995.
The Defendant may move for dissolution of this Order if and when it receives an incidental taking permit from the Secretary of the Interior.
It is FURTHER ORDERED that Defendant's Emergency Motion to Strike Or, in the Alternative, Objections to Plaintiffs' Supplemental Exhibits (Dkt. 31), Defendant's Emergency Motion For Leave to File Supplemental Exhibits as to the Issue of Standing (Dkt. 35), and Defendant's Emergency Motion for Leave to File Its Request for Judicial Notice of the Volusia County Home Rule Charter (Dkt. 37) are DENIED.
DONE AND ORDERED.
NOTES
[1] A study conducted by the Florida Marine Research Institute indicates that Volusia County is the sight of 2.8% of Loggerhead nesting activity in the State of Florida, and 3.1% of Green sea turtle nesting activity.
[2] The Plaintiffs have not named these exempted municipalities as Defendants in the instant lawsuit.
[3] On Volusia County's beaches, volunteers mark sea turtle nests and occasionally put cages around them. According to the Plaintiff's expert, studies show that even careful and diligent volunteers fail to discover eight percent of sea turtle nests. Hence drivers on the County's beaches may be running over nests without any awareness of what they are doing.
[4] Under the "incidental taking" provision of Endangered Species Act, a person may receive a permit to "take" endangered or threatened species. The holder of such a permit is not liable for any taking that falls within the scope of the taking authorized by the Secretary of the Interior. An applicant for a taking permit must apply to the Secretary of the Interior, and submit with the application a conservation plan. See 16 U.S.C. § 1539(a). Congress has mandated that the Secretary may issue an incidental taking permit only upon finding that "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the [conservation] plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) the measures, if any, required [by the Secretary as necessary and appropriate for the purposes of the conservation plan] will be met." See 16 U.S.C. § 1539(a)(2)(B).